B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS | DEFENDANTS |
|---|---|
| R. Wayne Klein, Chapter 11 Plan Administrator | Jonathan Peirsol (aka Jon Peirsol) |

| ATTORNEYS (Firm Name, Address, and Telephone No.) | ATTORNEYS (If Known) |
|---|---|
| Jason R. Naess, Parsons, Smith, Stone, Loveland & Shirley, LLP, P.O. Box 910, Burley, Idaho 83318 (208) 878-8382 | |

| PARTY (Check One Box Only) | PARTY (Check One Box Only) |
|---|---|
| ☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor ☐ Other<br>☐ Trustee | ☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor ☐ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Recovery of various fraudulent transfers under §§ 544, 548(a)(1(A), 550, recovery of post-petition transfer under §§ 549, 550, recovery on tortious interference with contract and breach of fiduciary duty claims.

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

| | |
|---|---|
| **FRBP 7001(1) – Recovery of Money/Property**<br>☐ 11-Recovery of money/property - §542 turnover of property<br>☐ 12-Recovery of money/property - §547 preference<br>☑ 13-Recovery of money/property - §548 fraudulent transfer<br>☑ 14-Recovery of money/property - other | **FRBP 7001(6) – Dischargeability (continued)**<br>☐ 61-Dischargeability - §523(a)(5), domestic support<br>☐ 68-Dischargeability - §523(a)(6), willful and malicious injury<br>☐ 63-Dischargeability - §523(a)(8), student loan<br>☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation |
| **FRBP 7001(2) – Validity, Priority or Extent of Lien**<br>☐ 21-Validity, priority or extent of lien or other interest in property | (other than domestic support)<br>☐ 65-Dischargeability - other |
| **FRBP 7001(3) – Approval of Sale of Property**<br>☐ 31-Approval of sale of property of estate and of a co-owner - §363(h) | **FRBP 7001(7) – Injunctive Relief**<br>☐ 71-Injunctive relief – imposition of stay<br>☐ 72-Injunctive relief – other |
| **FRBP 7001(4) – Objection/Revocation of Discharge**<br>☐ 41-Objection / revocation of discharge - §727(c),(d),(e) | **FRBP 7001(8) Subordination of Claim or Interest**<br>☐ 81-Subordination of claim or interest |
| **FRBP 7001(5) – Revocation of Confirmation**<br>☐ 51-Revocation of confirmation | **FRBP 7001(9) Declaratory Judgment**<br>☐ 91-Declaratory judgment |
| **FRBP 7001(6) – Dischargeability**<br>☐ 66-Dischargeability - §§523(a)(1),(14),(14A) priority tax claims<br>☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation,<br><br>actual fraud<br>☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny<br><br>**(continued next column)** | **FRBP 7001(10) Determination of Removed Action**<br>☐ 01-Determination of removed claim or cause<br><br>**Other**<br>☐ SS-SIPA Case – 15 U.S.C. §§78aaa et seq.<br>☐ 02-Other (e.g. other actions that would have been brought in state court |

| ☒ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ 760,720.00 |
| Other Relief Sought | |

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Jonathan Peirsol | BANKRUPTCY CASE NO.<br>17-40037-JDP | |
| DISTRICT IN WHICH CASE IS PENDING<br>Idaho | DIVISION OFFICE | NAME OF JUDGE<br>Pappas |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>June 6, 2018 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Jason R. Naess | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

Jason R. Naess
PARSONS, SMITH, STONE,
LOVELAND & SHIRLEY, LLP
137 West 13th Street
P.O. Box 910
Burley, Idaho 83318
(208) 878-8382
(208) 878-0146 - fax
Idaho State Bar #8407
Counsel for Plan Administrator

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF IDAHO

| | |
|---|---|
| In Re:<br><br>    J & J CHEMICAL, INC.,<br><br>                        Debtors. | Bankr. Case No.  17-40037-JDP<br><br>Chapter 11 |
| R. WAYNE KLEIN, Chapter 11 Plan<br>Administrator,<br><br>                        Plaintiff,<br><br>v.<br><br>JONATHAN PEIRSOL (aka JON<br>PEIRSOL),<br><br>                        Defendant. | Adv. Proceeding No. _____ |

## COMPLAINT

COMES NOW, R. Wayne Klein ("Plan Administrator"), the Chapter 11 Plan Administrator

in Bankruptcy No. 17-40037-JDP, by and through counsel, and hereby complains and alleges as

follows:

### PARTIES

1.      Plaintiff, Plan Administrator, is the designated Plan Administrator in the confirmed

chapter 11 plan of J & J Chemical, Inc. Pursuant to the confirmed Plan, Plan Administrator has the

authority to pursue certain avoidance actions, such as this adversary proceeding.

2.     Defendant, Jonathan Peirsol was the President of Debtor, J & J Chemical before that

company filed for bankruptcy.

JURISIDICTION AND VENUE

3.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C.

§§ 1334 and 157 and pursuant to the Rules of this Court and the United States District Court for the

District of Idaho, in that this action arises in and relates to the chapter 11 bankruptcy case filed by

Debtor on January 19, 2017, as Bankruptcy Case No. 17-40037-JDP in the Bankruptcy Court for the

District of Idaho. The confirmed chapter 11 Plan provides the Court retained jurisdiction over

certain matters, including "[t]o adjudicate, in an adversary proceeding if necessary, all reserved rights

of the Debtor under this Plan to prosecute causes of action under 11 U.S.C. section 544, 545, 546,

547, 548, 549, and/or 550 of the United States Bankruptcy Code and applicable State Law."

4.     This proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (H), and

(O). Plan Administrator consents to entry of final orders or judgment by the bankruptcy judge as to

all matters and proceedings in the above-entitled case.

5.     Venue is proper in this court pursuant to 28 U.S.C. §§ 1408 and 1409.

COUNT I
§§ 548(a)(1)(A), 550
Attorney General Payment

6.     Prior to April 2015, Jonathan Peirsol advertised and sold certain tax preparation

services to various consumers from his office in Blackfoot, Idaho. There were various errors in

the tax returns prepared by Peirsol, including claims of deductions to which the consumers were

not entitled to receive. Many of the consumers for whom Peirsol prepared tax returns were

audited. As a result, the consumers lost the fees paid to Peirsol to prepare their returns, and had

to repay the Tax Commission refunds they had received based on the erroneous returns, with

interest and, at times, penalty amounts.

7.      The Idaho Attorney General's Office commenced an investigation and action

against Peirsol in the Fourth Judicial District of the State of Idaho, in Ada County.  To resolve

the issues raised by the Attorney General's investigation into Peirsol's tax preparation practices,

Peirsol entered an Assurance of Voluntary Compliance (the "AVC") with the Attorney General's

Office.

8.      Included in the AVC was a requirement that Peirsol pay the Attorney General

$80,000.00.  That amount was to be used by the Attorney General in furtherance of its duties and

activities under the Idaho Consumer Protection Act and to pay restitution to consumers harmed

by Peirsol, as determined by the Attorney General.  Per the AVC, Peirsol was to pay the required

amount to the Attorney General.

9.      Peirsol signed the AVC on April 21, 2015.

10.     An Order Approving AVC was entered by the District Court in Ada County on

May 4, 2015.

11.     On or about May 15, 2015, a $80,025.00 payment was made, with $80,000.00 to

the Attorney General pursuant to the AVC and the other $25.00 being a fee associated with

wiring the money to the Attorney General.  The payment, however, was made from a Bank of

Commerce bank account XXXXXX9804, which was a bank account of J & J Chemical.  In other

words, J & J Chemical paid the $80,025.00 on behalf of Peirsol.

12.     J & J Chemical made the transfer with actual intent to hinder, delay, or defraud

any entity to which it was or became, on or after the date of the transfer, indebted.

13.     At the time of the transfer, J & J Chemical was insolvent or had other

unmanageable indebtedness.

14.     There was a special relationship between J & J chemical and Peirsol, as Peirsol was the company's President.

15.     It is expected other badges of fraud exist and will be developed through discovery.

16.     On January 19, 2017, J & J Chemical filed for chapter 11 bankruptcy.

17.     In August 2017, Plan Administrator and the Idaho Attorney General's office entered a Settlement Agreement and Release in regards to the $20,000.00 of the $80,000.00 that was utilized by the Attorney General in furtherance of its duties and activities under the Idaho Consumer Protection Act.  Per the Settlement Agreement and Release, the Attorney General's office was to turn the $20,000.00 over to the J & J Chemical bankruptcy estate.  The Attorney General had already distributed the remaining $60,000.00 of the $80,000.00 as restitution to consumers harmed by Peirsol's actions.

18.     On October 11, 2017, the Bankruptcy Court entered an Order approving the Settlement Agreement between the Attorney General's office and the J & J Chemical bankruptcy estate.  The Attorney General subsequently provided the estate $20,000.00

COUNT II
§§ 548(a)(1)(B), 550
Attorney General Payment

19.     Plan Administrator realleges paragraphs 1 through 18, and makes the same a part of Count II as though fully set out herein.

20.     J & J Chemical received less than a reasonably equivalent value in exchange for the transfer of $80,000.00 to the Attorney General and the $25.00 wire transfer fee.  The obligation to the Attorney General was Peirsol's and J & J Chemical did not receive any benefit or value from transferring the funds to the Attorney General on Peirsol's behalf.

21.     J & J Chemical was insolvent on or about May 15, 2015, or became insolvent as a result of the transfer to the Attorney General.

COUNT III
§§ 548(a)(1)(A), 550
Right to Payment from Simcox

22.     Plan Administrator realleges paragraphs 1 through 21, and makes the same a part of Count III as though fully set out herein.

23.     On or about September 22, 2014, J & J Chemical obtained a Promissory Note from Jeffery Simcox and Karen Adams (the "2014 Note"). Pursuant to the 2014 Note, Simcox and Adams promised to pay J & J Chemicals $210,000.00 with four percent (4%) simple annual interest.

24.     Simcox and Adams were to pay J & J Chemicals 120 installments of $2,126.15 per month, with the first payment beginning on or before November 1, 2014, and continuing through the final payment on October 1, 2024. The 2014 Note identified late payment charges, and remedies upon default.

25.     Simcox and Adams signed the 2014 Note on September 23, 2014.

26.     The 2014 Note was a result of and tied to a sale by J & J Chemical of certain business assets to Simcox and Adams.

27.     In 2015, J & J Chemical filed a complaint against Simcox, Adams, and others in the Seventh Judicial District for the State of Idaho, County of Bingham, asserting claims arising out of the sale of the business assets related to the 2014 Note. The various defendants counterclaimed.

28.     The defendants also filed a complaint against Peirsol and J & J Chemical in the Third Judicial District Court for the State of Utah, Salt Lake County, asserting claims arising out of the sale of the business assets related to the 2014 Note.

29.     On or about May 5, 2016, the parties to the various litigation relating to the sale of business assets and 2014 Note entered a Settlement, Release, No Disparagement, and Non-

Compete Agreement (the "May 2016 Agreement").

30.     Per the May 2016 Agreement, Simcox agreed to pay "J&J Chemical or Jon Peirsol" $20,000.00 within 30 days of the May 2016 Agreement.  That amount was paid.

31.     In addition, Simcox agreed to pay "Peirsol" $45,000.00 by monthly payments of $1,000.00 per month for forty-five (45) months beginning on July 1, 2016.  To effectuate the transfer of the right to payment under the 2014 Note from J & J Chemical to Peirsol, Peirsol had Simcox sign a new Promissory Note (the "2016 Note").  In addition, the May 2016 Agreement required the parties to "execute the letter attached as Exhibit 2 [to the May 2016 Agreement] authorizing Title Financial Specialty Service to substitute the Original [2014] Note . . . with the Promissory [2016] Note."

32.     Title Financial Specialty Service ("TFSS") was acting as an escrow agent for the sale of business assets relating to the 2014 Note.

33.     The May 2016 Agreement released Adams from any obligation under the 2014 Note, and the only right to payment moving forward was the obligation from Simcox to Peirsol under the 2016 Note.

34.     Peirsol signed the May 2016 Agreement and the letter to TFSS substituting the 2016 Note for the 2014 Note in his capacity as an individual and for J&J Chemical.

35.     The letter to TFSS provides:

> TFSS is servicing the attached September 22, 2014 Promissory Note.  On that Note, J&J Chemical, Inc. is the payee.  The payors are Jeffery Simcox and Karen Adams.
>
> Upon TFSS's receipt of this letter, the parties request and authorize TFSS to do the following:
> 1. Substitute the attached May ___, 2016 Promissory Note for the September 22, 2014 Promissory Note.
> 2. Remove Karen Adams as a payor on this account.
> 3. Substitute Jon Peirsol for J&J Chemical, Inc., as the payee on this account.

J&J Chemical, Inc. shall pay TFSS fees for the above actions.

36.     J & J Chemical transferred the right to payment to Peirsol with actual intent to hinder, delay, or defraud any entity to which it was or became, on or after the date of the transfer, indebted.

37.     At the time of the transfer, J & J Chemical was insolvent or had other unmanageable indebtedness.

38.     There was a special relationship between J & J Chemical and Peirsol, as Peirsol was the company's President.

39.     It is expected other badges of fraud exist and will be developed through discovery.

COUNT IV
§§ 548(a)(1)(B), 550
Right to Payment from Simcox

40.     Plan Administrator realleges paragraphs 1 through 39, and makes the same a part of Count IV as though fully set out herein.

41.     J & J Chemical received less than a reasonably equivalent value in exchange for the transfer to Peirsol of the right to payment from Simcox.  The right to receive payment as a result of the sale of J & J assets was J & J Chemical's and it did not receive any benefit or value from transferring the right to payment to Peirsol.  Rather, it lost the benefit of receiving the future stream of funds from the sale and Note.

42.     J & J Chemical was insolvent In May and June 2016, or became insolvent as a result of the transfer of the right to payment from Simcox.

COUNT V
§§ 544, 548(a)(1)(A), 550
Cash Withdrawals by Peirsol

43.     Plan Administrator realleges paragraphs 1 through 42, and makes the same a part of Count V as though fully set out herein.

44.     Peirsol was the President of J & J Chemical and controlled the finances and had access to and control of the bank accounts of J & J Chemical pre-petition and post-petition prior to the appointment of a chapter 11 trustee.

45.     Beginning in March 2013, Peirsol began withdrawing cash from J & J Chemical's bank accounts.  The withdrawals include the following:

(a) $16,486.00 from J & J Chemical's Bank of Commerce account ending 9804; and

(b) $99,017.02 from J & J Chemical's Wells Fargo account ending 4475.

The total amount of cash J & J Chemical transferred to Peirsol via the cash withdrawals was $115,503.02.

46.     Some of the withdrawals were made in Las Vegas, others at Cactus Pete's casino in Jackpot, and other's at the Fort Hall casino.

47.     Peirsol did not repay any such cash withdrawals to J & J Chemical.

48.     In addition, on June 2, 2017, Peirsol instructed the then manager of J & J Chemical to write him a $2,500.00 check for the supposed purpose of reimbursing Peirsol for previously purchased computers.  The manager deposited $2,500.00 into Peirsol's personal bank account.

49.     There are no records of any computer purchases justifying the $2,500.00 payment to Peirsol.

50.     J & J Chemical provided Peirsol the $115,503.02 in cash from the withdrawals from J & J Chemical's accounts and the $2,500.00 related to the supposed computer reimbursement with actual intent to hinder, delay, or defraud any entity to which it was or became, on or after the date of the transfer, indebted.

51.     At the time of the transfers, J & J Chemical was insolvent or had other unmanageable indebtedness.

52.     There was a special relationship between J & J Chemical and Peirsol, as Peirsol was the company's President.

53.     It is expected other badges of fraud exist and will be developed through discovery.

## COUNT VI
§§ 548(a)(1)(B), 550
Cash Withdrawals by Peirsol

54.     Plan Administrator realleges paragraphs 1 through 53, and makes the same a part of Count VI as though fully set out herein.

55.     J & J Chemical received less than a reasonably equivalent value in exchange for the transfer of the $115,503.02 to Peirsol via cash withdrawals.  The cash provided to Peirsol was J & J Chemical funds and Peirsol did not repay or otherwise provide J & J Chemical anything of value for the cash that was transferred.  Also, there are no computers related to the $2,500.00 for which Peirsol received the reimbursement amount, and J & J Chemical did not receive any benefit from paying Peirsol that amount.

56.     J & J Chemical was insolvent at the time the transfers were made, or became insolvent as a result of the transfers.

## COUNT VII
§§ 549, 550
Cash Withdrawals by Peirsol

57.     Plan Administrator realleges paragraphs 1 through 56, and makes the same a part of Count VII as though fully set out herein.

58.     Post-petition, on March 13, 2017, Peirsol withdrew an additional $30.00 in cash from the J & J Chemical Inc. Debtor in Possession account with Wells Fargo.  Peirsol did not repay the $30.00 cash withdrawal.

59.     The $30.00 transferred out of the Debtor in Possession account was estate property and was not authorized by the Code or the Court

COUNT VIII
§§ 544, 548(a)(1)(A), 550
Transfers to Peirsol Accounts

60.     Plan Administrator realleges paragraphs 1 through 59, and makes the same a part of Count VIII as though fully set out herein.

61.     Peirsol was the President of J & J Chemical and controlled the finances and had access and control of the bank accounts of J & J Chemical pre-petition.

62.     Beginning in February 2013, J & J Chemical began transferring funds from J & J Chemical accounts to Peirsol's checking and savings accounts. The transfers include the following:

    (a) $8,742.60f rom J & J Chemical's Wells Fargo account ending 4475 to Peirsol's Checking accounts;

    (b) $24,788.37 from J & J Chemical's Wells Fargo account ending 4475 to Peirsol's Savings accounts;

    (c) $4,500.00 from J & J Chemical's Wells Fargo account ending 7535 to Peirsol's Checking account; and

    (d) $2,000.00 from J & J Chemical's Wells Fargo account ending 7535 to Peirsol's Savings accounts.

The total amount J & J Chemical transferred from its accounts to Peirsol's various bank accounts was $40,030.97.

63.     Peirsol transferred $350.00 from his savings account back in to the J & J Chemical Wells Fargo account ending 4475, and the net amount transferred out by J & J Chemical to Peirsol's bank accounts is $39,680.97.

64.     J & J Chemical transferred the $39,680.97 to Peirsol with actual intent to hinder, delay, or defraud any entity to which it was or became, on or after the date of the transfer,

indebted.

65.    At the time of the transfers, J & J Chemical was insolvent or had other

unmanageable indebtedness.

66.    There was a special relationship between J & J Chemical and Peirsol, as Peirsol

was the company's President.

67.    It is expected other badges of fraud exist and will be developed through discovery.

COUNT IX
§§ 548(a)(1)(B), 550
Transfers to Peirsol Accounts

68.    Plan Administrator realleges paragraphs 1 through 67, and makes the same a part

of Count IX as though fully set out herein.

69.    J & J Chemical received less than a reasonably equivalent value in exchange for

the transfers of the $39,680.97 to Peirsol's bank accounts.  The transferred monies were J & J

Chemical funds and Peirsol did not repay or otherwise provide J & J Chemical anything of value

for the funds that were transferred.

70.    J & J Chemical was insolvent at the time the transfers were made, or became

insolvent as a result of the transfers.

COUNT X
Tortious Interference with Contracts

71.    Plan Administrator realleges paragraphs 1 through 70, and makes the same a part

of Count X as though fully set out herein.

72.    Beginning in 2013, J & J Chemical started leasing certain major equipment to

various customers throughout eastern Idaho.  In doing so, J & J Chemical entered formal

"Lease/Agreement" with the lessees, specifying the equipment that was to be leased.  Typically,

each of the leases identified the monthly rent for the equipment and specified whether any

deposit was required.  The majority of the Lease/Agreements also specified that, in using the

equipment, the lessee "[m]ust use JJ Chemical Inc. products only throughout duration of

contract."  In other words, J & J Chemical set itself up to receive an income stream from the

monthly rent amounts and also from product sales as the lessees ordered and used J & J

Chemical products in the equipment.  J & J Chemical entered such leases up through and after

the time it filed for chapter 11 bankruptcy protection.  Among the leases entered into are:

      (a)     A January 20, 2017, dishwasher lease with Taqueria El Rancho #3;

      (b)     An April 17, 2013, dishwasher and water softener lease with L & J
             Restaurant;

      (c)     An April 1, 2015, water softener lease with Palacio's;

      (d)     A January 24, 2017, dishwasher and water softener lease with Grandpa's
             Barbeque #2;

      (e)     A March 15, 2014, dishwasher lease with Charley's – Silver Rail; and

      (f)     A water softener lease with the Willow Bay Campground.

It is anticipated additional Lease/Agreements may be identified through the discovery process.

      73.     Each of the Lease/Agreements, with the exception of the agreement with the

Willow Bay Campground, was signed by Jon Peirsol on behalf of J & J Chemical.  The Willow

Bay Campground agreement was signed by Matt Peirsol, Jon Peirsol's brother.

      74.     In addition to the Lease/Agreements for major equipment, J & J Chemical entered

a number of "Equipment Placement Agreements" with various customers, under which J & J

Chemical was allowed to place various equipment (*i.e.*, hand soap dispensers, toilet paper

dispensers, other chemical dispensers, etc.) in the customer's business locations.  Pursuant to the

Equipment Placement Agreements, the customers were required thereafter to "dispense only

those products manufactured, distributed, and delivered by [J & J Chemical] during the term" of

the agreement.  In that way, J & J Chemical secured an income stream as the customers under

such agreements were required to order and purchase products from J & J Chemical.  Among the

Equipment Placement Agreements entered into are:

(a)    Equipment Placement Agreement with Nalley's Arctic Circle, beginning

January 1, 2013;

(b)    Equipment Placement Agreement with New Hong Kong, beginning

August 25, 2016;

(c)    Equipment Placement Agreement with Charley's Bar, DBA Silver Rail

Inc., beginning January 1, 2013;

(d)    Equipment Placement Agreement with Taqueria El Rancho #3, with an

unspecified beginning date, signed January 23, 2017;

(e)    Equipment Placement Agreement with Taqueria El Rancho #2, beginning

February 3, 2017;

(f)    Equipment Placement Agreement with Grandpa's Barbeque #2, beginning

January 24, 2017;

(g)    Equipment Placement Agreement with Jaliscos #2, beginning January 1,

2013;

(h)    Equipment Placement Agreement with L & J Restaurant, beginning April

17, 2013;

(i)    Equipment Placement Agreement with Taste of India, beginning February

1, 2015;

(j)    Equipment Placement Agreement with Willow Bay, beginning March 18,

2016; and

(k)    Equipment Placement Agreement with T Co. LLC, with no beginning date

but signed May 13, 2016.

It is anticipated additional Equipment Placement Agreements may be identified through the discovery process.

75.     Each of the Equipment Placement Agreement's is signed by Jon Peirsol.

76.     After the chapter 11 case was filed, Jon Peirsol pled guilty to a felony charge of aiding and abetting the preparation of a false individual income tax return on March 1, 2017, and entered a plea agreement to serve 12 months and one day of incarceration.  The U.S. Trustee subsequently filed a motion to convert the chapter 11 case to a chapter 7 case, to dismiss the case, or to appoint a chapter 11 trustee.  After a hearing on the motion, the Court decided to appoint a chapter 11 trustee to manage the affairs of J & J Chemical.

77.     Under the supervision of the chapter 11 trustee, a chapter 11 plan was confirmed, and the Plan Administrator was designated and authorized to oversee the implementation of the Plan.

78.     In March 2018, Peirsol, with others, formed a new company, JBP Enterprises Inc., with Peirsol as President.

79.     Sometime in the spring of 2018, Peirsol was released from incarceration.

80.     Since that time, per information and belief, Peirsol has been contacting J & J Chemical customers, and convincing such customers to utilize JBP Enterprises for services instead of J & J Chemical.

81.     Several J & J Chemical customers have used what appears to be a form "Termination of Contract" letter, which they have sent to J & J Chemical, indicating they are terminating "any and all agreements with J&J Chemical in accordance with their terms.  This termination includes all recurring orders, standing orders, and outstanding purchase orders that may be cancelled without prior notice."  Other customers have verbally cancelled their contracts

with J & J Chemical.  Per information and belief, the contract terminations have occurred due to

Peirsol contacting J & J Chemical customers and convincing them to use JBP Enterprises'

services instead.

82.    Over time, J & J Chemical received the following amounts in total sales under

contracts that have been terminated since Peirsol was released from incarceration:

(a)    Contract with Silver Rail/Charley's Bar:  $12,913.75

(b)    Contract with Grandpa's Babeque # 2:  $3,112.35

(c)    Contract with Taqueria El Rancho #3:  $8,486.93

(d)    Contract with Willow Bay Campground:  $2,025.75

(e)    Contract with Arctic Circle:  $3,007.30

(f)    Contract with New Hong Kong:  $3,124.83

(g)    Contract with Jalisco's #2:  $37,674.87

(h)    Contract with Taqueria El Rancho #2:  $11,056.51

(i)    Contract with Taste of India:  $3,471.70

(j)    Contract with Willow Bay Café:  $704.70

(k)    Contract with Jalisco's #1:  $31,271.67

(l)    Contract with Mandarin House:  $9,949.70

(m)    Contract with Martha's Café:  $9,688.60

There are at least two additional terminated contracts, with Palacio's and L&J Restaurant, and

the damages from those contracts will be determined at trial.

83.    Each of the terminated contracts had a monthly income stream that helped to

support the operation of J & J Chemical.

84.    Due to Peirsol's interference with the contracts of J & J Chemical with its various

customers, the likelihood of J & J Chemical continuing as a viable business continues to

diminish.  In addition to the monthly damages identified above, the damages to J & J Chemical include the potential inability to continue under the chapter 11.

85.    The total amount of damages resulting from Peirsol's interference with J & J Chemical's customers and contracts will be identified and demonstrated at trial.

COUNT XI
Breach of Fiduciary Duty

86.    Plan Administrator realleges paragraphs 1 through 85, and makes the same a part of Count XI as though fully set out herein.

87.    Peirsol was a President and Director of J & J Chemical prior to the commencement of the J & J Chemical chapter 11 case.

88.    As a President and Director, Peirsol owed J & J Chemical fiduciary duties of loyalty, good faith, and care.

89.    Peirsol breached his fiduciary duties of loyalty, good faith, and care to J & J Chemical when he caused J & J Chemical to make various transfers to a number of entities for personal expenses.  Among the personal expenses of Peirsol paid by J & J Chemical are:

(a)    $21,347.89 paid to Kia Motors towards Peirsol's personal vehicle;

(b)    $133,762.37 in payments by J & J Chemical towards Peirsol's personal residence mortgage with Wells Fargo;

(c)    $107,820.67 in payments by J & J Chemical to Capital One for a personal credit card of Peirsol;

(d)    $7,228.15 in payments by J & J Chemical to DirecTV for satellite television services at Peirsol's home;

(e)    $15,204.00 in payments by J & J Chemical to New York Life for Peirsol's life insurance policy;

(f)      $46,853.77 in payments to American Express for a personal credit card of

Peirsol; and

(g)      $9,000.00 in payments to TVG Network for online wagering by Peirsol.

In total, Peirsol caused J & J Chemical to make the $341,216.85 in payments to the various third

parties identified above for his own personal benefit and gain.  Peirsol also caused J & J

Chemical to make a variety of other payments for his own benefit, including, among others,

additional credit card payments, property tax payments, loan payments, automobile insurance on

Peirsol's personal vehicles, and payments to casinos.  It is estimated such additional payments

equaled at least $20,274.91, with the actual amount to be determined at trial.

90.      In addition, Peirsol was a President and Director of J & J Chemical at the time it

made the various other fraudulent transfers identified in this Complaint.  Those transfers total

$262,738.99.

91.      J & J Chemical was damaged by Peirsol's breach of fiduciary duty in an amount at

least equal to the amounts transferred by J & J Chemical for Peirsol's benefit.  The monies

transferred were J & J Chemical's funds, and should have been available to and for the use of the

company.  Instead, Peirsol caused and/or allowed those funds to be siphoned away for his own

personal benefit.

WHEREFORE, Plan Administrator prays for Judgment against Peirsol as follows:

a.      On Count I, for a recovery of $60,025.00 in fraudulent transfers;

b.      On Count II, for a recovery of $60,025.00 in fraudulent transfers;

c.      On Count III, for recovery of $45,000.00 in fraudulent transfers;

d.      On Count IV, for recovery of $45,000.00 in fraudulent transfers;

e.      On Count V, for recovery of $118,003.02 in fraudulent transfers;

f.      On Count VI, for recovery of $118,003.02 in fraudulent transfers;

g.   On Count VII, for recovery of $30.00 in unauthorized post-petition transfers;

h.   On Count VIII, for recovery of $39,680.97 in fraudulent transfers;

i.   On Count IX, for recovery of $39,680.97 in fraudulent transfers;

j.   While some of the fraudulent transfer counts seek the same recovery under differing theories, the cumulative amount of fraudulent transfers, and of post-petition transfers, not including duplications under differing theories, is: $262,738.99.

k.   On Count X, an amount of damages to be proven at trial due to Peirsol's tortious interference with J & J Chemical's contracts;

l.   On Count XI, an amount at least equal to $624,230.75 due to Peirsol's breach of fiduciary duty to J & J Chemical, with the actual amount to be determined at trial. Of the specific amount prayed for in relation to this count, $262,738.99 is also sought under alternative theories in this complaint.

m.   That Plan Administrator be awarded reasonable attorney's fees in the sum of $5,000.00 should this action terminate as a default judgment, together with such other and additional sums as the Court deems just and proper should the action be contested pursuant to Idaho Code §§ 12-120 and 12-121, and to the extent equity requires an order for Plan Administrator to be made whole, plus court costs; and

n.   For such other and further relief as the court may deem just and proper.

DATED this __6th__ day of June, 2018.

PARSONS, SMITH, STONE,
LOVELAND & SHIRLEY, LLP

Jason R. Naess
Attorneys for Plan Administrator

**VERIFICATION**

STATE OF UTAH        )
                     ) ss
County of _Salt Lake_  )

R. Wayne Klein, being first duly sworn on oath, deposes and says:

That he is the Plaintiff in the above-entitled action; that he has read the contents of the

foregoing Complaint, and knows the contents thereof and the facts stated therein he believes

to be true.

_R. Wayne Klein_
R. Wayne Klein, Plan Administrator

Subscribed and sworn to before me, this 6th day of June, 2018.

_[signature]_
Notary Public for Utah
Residing at _Salt Lake City_
My commission expires on _July 12, 2020_

DIANNA DEBATE
Notary Public  State of Utah
My Commission Expires on:
July 12, 2020
Comm. Number: 689932

COMPLAINT  – Page 19